IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

GILMA MARINA HESS,

       Plaintiff,

v.                                     CIVIL ACTION NO. 2:13-cv-394

CAROLYN W. COLVIN,
Acting Commissioner,
Social Security Administration,

       Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Gilma Marina Hess ("Ms. Hess") filed a complaint pursuant to 42 U.S.C. § 405(g) that seeks judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("Acting Commissioner"), which denied Ms. Hess' claim for Disability Insurance Benefits ("DIB") pursuant to Title II of the Social Security Act. Both parties have filed motions for summary judgment, ECF Nos. 14 and 15, which are now ready for a recommended resolution. This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. After reviewing the briefs, the undersigned disposes of cross-motions for summary judgment on the papers without a hearing pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 7(J). For the following reasons, the undersigned **RECOMMENDS** that Ms. Hess' motion for summary judgment, ECF No. 14, be **GRANTED** to the extent it seeks reversal and remand of the Acting

Commissioner's decision; the Defendant's motion for summary judgment, ECF No. 15, be **DENIED**; the final decision of the Acting Commissioner be **VACATED**, and that this matter be **REMANDED** for further proceedings consistent with this recommendation.

## I. PROCEDURAL BACKGROUND

On August 18, 2010, Ms. Hess filed her application for DIB, alleging a disability onset date of May 28, 2004 due to scar tissue, fibroids, pelvic pain, and depression. R. 175-86.[1] To qualify for DIB, Ms. Hess must have insurance coverage at the time of disability. 42 U.S.C. § 423(a); 20 C.F.R. §§ 404.101(a); 404.131(a). Ms. Hess' date last insured ("DLI") was December 31, 2009. R. 172. Accordingly, Ms. Hess had the burden of establishing the existence of a disability on or before that date. Her application was initially denied on January 3, 2011, R. 69-76, and denied again upon reconsideration on May 12, 2011. R. 78-85. Ms. Hess requested a hearing in front of an administrative law judge ("ALJ") on June 30, 2011, R. 109-110, which was held on March 6, 2012. R. 30-68. The ALJ issued his decision denying Ms. Hess' DIB application on April 25, 2012. R. 16-29. Ms. Hess petitioned the Appeals Council for the Office of Disability and Adjudication ("Appeals Council") for review of the ALJ's decision. Ultimately, the Appeals Council denied Ms. Hess' request for review of the ALJ's decision on June 7, 2013, R. 1-5, and the ALJ decision became the final decision of the Acting Commissioner. After exhausting her administrative remedies, Ms. Hess filed her complaint for judicial review of the Acting Commissioner's final decision on August 2, 2013. ECF No. 2. The Acting Commissioner filed an Answer on September 27, 2013. ECF No. 9. Ms. Hess filed her motion for summary judgment on November 15, 2013, ECF No. 14, and the Acting

---

[1] "R." refers to the certified administrative record that was filed under seal on September 27, 2013, pursuant to Local Civil Rules 5(B) and 7(C)(1).

2

Commissioner filed a cross-motion for summary judgment on December 16, 2013, ECF No. 15. Ms. Hess replied in opposition to the Acting Commissioner's motion for summary judgment on December 30, 2013. ECF No. 17. No additional briefing has been filed, and the time to do so expired. Accordingly, the matter is ripe for recommended disposition.

## II. STANDARD OF REVIEW

On judicial review of the Acting Commissioner's final decision, the Court is limited to determining whether the decision was supported by substantial evidence in the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *see also Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hays*, 907 F.2d at 1456 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))). The Acting Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Perales*, 402 U.S. at 390. While the standard is high, where the ALJ's determination is not supported by substantial evidence in the record, or where the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential five-step evaluation of a disability claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. § 404.1520. The ALJ conducts this five-step analysis for the Acting Commissioner, and it is that analysis the district court must examine on judicial review to determine whether the correct legal standards

3

were applied and whether the resulting decision is supported by substantial evidence in the record. In accordance with the five-step analysis, the ALJ made the following findings of fact and conclusions of law.

First, Ms. Hess met the insured requirements of the Social Security Act through December 31, 2009, and she had not engaged in substantial gainful activity ("SGA") since May 28, 2004, the alleged disability onset date. R. 21. Second, Ms. Hess had the following severe impairments: chronic pelvic/abdominal pain, and endometriosis, which limited her ability to perform the demands of basic work activities. R. 21-23 (citing 20 C.F.R. § 404.1520(c)). The ALJ found the other alleged impairments—specifically, back impairment and depression—were non-severe because they either did not exist continuously for a period of twelve months, were responsive to medication, did not require significant medical treatment, or did not result in any continuous exertional or nonexertional limitations. R. 22 (citing 20 C.F.R. § 404.1509; *Gross v. Heckler*, 785 F.2d 1163 (4th Cir. 1986); Social Security Ruling 85-28).

The ALJ employed an extensive analysis with regard to Ms. Hess' alleged mental impairment, i.e. depression, in accordance with 20 C.F.R. Part 404, Subpart P, Appendix 1, also known as the "paragraph B" criteria. R. 22-23. The ALJ concluded that any alleged medically determinable mental impairment like depression was non-severe because it caused no more than mild limitations in Ms. Hess' activities of daily living, social functioning, and concentration, persistence, and performance, and because there were no episodes of decompensation. R. 22 (citing 20 C.F.R. § 404.1520a(d)(1)).

Third, Ms. Hess did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

4

Appendix 1. R. 23 (citing 20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526). Fourth, Ms. Hess has the residual functional capacity ("RFC") to perform unskilled sedentary work, with the following limitations: no climbing, no work around unprotected heights or dangerous machinery, with job tasks that are simple, repetitive, and non-production. R. 23-28 (citing 20 C.F.R. § 404.1567(a)). Lastly, after considering Ms. Hess' age—46 years old, or a younger individual, as of the DLI—her high school education, ability to communicate in English, her prior work experience, RFC, and the testimony of an impartial Vocational Expert ("VE") at the hearing, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ms. Hess could perform, and thus, she was not under disability between the period of May 28, 2004 and December 31, 2009. R. 28-29.

## IV. RELEVANT FACTUAL BACKGROUND

As of the ALJ hearing on March 6, 2012, Ms. Hess was forty-eight years old, married, with a high school education, and previous work experience as a computer programmer from 1998 until May 28, 2004, the alleged onset date of disability and the date last employed. R. 177. On April 8, 2003, Ms. Hess underwent a total abdominal supracervical hysterectomy to treat her symptomatic fibroid uterus. R. 46, 468. Since then, Ms. Hess generally claims that she has experienced pain in her left lower abdomen that has resulted in her inability to work. At the ALJ hearing, Ms. Hess provided the following testimony:

Ms. Hess and her husband live with her mother-in-law and pay her rent. R. 35. They have no children. *Id.* Since Ms. Hess became unable to work in 2004, R. 40, her husband started working part-time in the lawn mowing business in addition to his full-time job, R. 39, yet they have lost their house and savings due to Ms. Hess' medical impairments. R. 56. When asked to

5

describe the pain, Ms. Hess testified that the pain is located in the left lower part of her abdomen, that it is always there, even when she sleeps, and that she has used pain medications and physical therapy to address the pain. R. 38. Ms. Hess described her daily routine as attempting to manage her pain. R. 40. She can dress, bathe, and care for herself; it just takes her twice as long as the average person. R. 44. She is able cook a few times per month and partially assist with the laundry, R. 41, but will take her medications, rest, do some reading, attempt to perform stretches learned in physical therapy, and rest some more. R. 40. She is best able to rest and ease her pain in a reclined position, or by lying down horizontally on her bed. R. 41.

Ms. Hess is also able to drive, but only if the seat is in a reclined position. R. 42. She will go shopping with her mother-in-law, *id.*, but is unable to carry anything greater than five pounds in each hand. R. 45. Ms. Hess attempts to socialize with friends outside of the home, because being alone in her home can be isolating and depressing, but when she visits friends, she will ultimately have to lay down on their couch, sofa, or bed. R. 42. She also attends church meetings between once or twice a week, depending on her level of pain, but uses a portable zero gravity chair at the meeting. R. 43-44. Ms. Hess can walk for about ten minutes before the pain makes it too difficult to continue, and within five minutes of sitting, she will have to change positions. R. 45.

Ms. Hess testified that the abdominal pain, which she described as feeling like someone is twisting her organs, started after her hysterectomy in 2003 and has not completely resolved since. R. 52. The pain started getting worse in June or July of 2009, R. 55, at which point treating physician Dr. Sakhel had referred her for exploratory laparoscopic surgery in an attempt to determine the cause of the pain. R. 48. After also being referred to other physicians, the

6

exploratory surgery was cancelled. *Id.* Ultimately, a different doctor, Dr. Rebecca Ryder, performed the exploratory surgery in October of 2010, after the DLI, and administered injections to ease the abdominal pain. R. 50-51. Ms. Hess testified that while some of the "superficial pain" and skin sensitivity was relieved after the surgery and injections, the "deeper pain" she has suffered since 2003 has never been relieved. R. 51-52. Ms. Hess also testified that she has never seen a psychiatrist or psychologist for depression, but that her pain management doctor has prescribed her Cymbalta, which is prescribed to treat depression, or chronic pain in the muscles and bones. R. 59.

In reaching his decision that Ms. Hess was not disabled, the ALJ found that Ms. Hess' medically determinable impairments could reasonably be expected to cause the alleged symptoms, but Ms. Hess' statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the ALJ's RFC assessment of unskilled sedentary work. R. 24. "The medical evidence of record confirms that [Ms. Hess] has suffered from chronic pelvic pain for some time. Several physical examinations during the relevant period have shown her to have tenderness, particularly in her left lower quadrant." *Id.* In his decision, the ALJ summarized the medical record evidence chronologically for "the relevant period," starting in August of 2004 through early December of 2009. R. 24-25.

The ALJ accurately concluded that between 2004 and 2009, Ms. Hess "had a number of normal physical examinations, as well as several examinations where she was noted to have only minimal or mild abdominal/pelvic tenderness." R. 26 ("Moreover, several of the notes from [Ms. Hess'] treating providers show that [Ms. Hess'] pain either improved or ceased at times during this period."). Indeed, in late 2004, Ms. Hess' physical examinations and test results were

7

generally normal, however she did present with varying degrees of tenderness and pain in her abdomen and pelvic region, with no certain diagnosis even after radiological tests and a colonoscopy. *See* R. 24 (citing R. 852-56 (presenting with chronic lower pelvic pain to gynecologic oncologist Dr. Munir Nasr on August 10, 2004; finding tenderness on palpation to lower quadrant; and recommending ultrasound, colonoscopy, and possibly laparoscopy to rule out other diagnoses); R. 336-38 (presenting with pelvic pain to gastroenterologist Dr. Alex Williams on September 2, 2004; finding minimal tenderness in lower left quadrant; suspecting "pain is musculoskeletal," but also agrees with recommendation for colonoscopy); R. 332-33 (on referral from Dr. Williams, presenting again with lower abdomen pain to radiologist Dr. Richard Thomas on September 13, 2004 who performed radiologic examination of upper gastrointestinal tract; finding normal upper gastrointestinal series and small bowel follow-through); R. 331 (referred by Dr. Nasr to Dr. Gary Payman for a colonoscopy on October 6, 2004, which was generally normal, but revealed internal hemorrhoids, and "abdominal pain was reproducible with looping of scope."); R. 334-35 (following up with Dr. Williams on November 4, 2004, diagnosing Ms. Hess with "chronic abdominal pain, likely related to adhesions," and recommending that she eat a balanced diet, "take it easy," and suggested that a laparoscopic exam might be needed in the future to confirm diagnosis)).

The medical record evidence from 2005 to 2008 documented similar symptoms, although Ms. Hess was now prescribed and taking pain medication. *See* R. 24-25 (citing R. 352-53 (presenting to gynecologist Dr. Theresa Whibley for the first time on October 3, 2005 for yearly exam; Dr. Whibley noted that Ms. Hess "sits on pillow!" and complains of pelvic pain that makes it difficult to sit, stand, and walk; diagnosed Ms. Hess with chronic pelvic pain, prescribed

8

her Paxil, and suggested a referral to a pain specialist); R. 556-57 (presenting as a new patient for primary care physician Dr. Gregory Meyer on December 22, 2005 with complaints of "pelvic pain for the past couple of years," stating that the Paxil recently prescribed by Dr. Whibley seems to have helped with the pain; performed a physical exam with generally normal results and diagnosed Ms. Hess with chronic left side pelvic pain, which could be explained by pelvic adhesions or some musculoskeletal complement); R. 870-74 (presenting for a medical source opinion and functional assessment to Dr. Gustavo Vargas on December 27, 2005; diagnosing Ms. Hess with chronic pelvic pain probably secondary to adhesions, and concluding she can walk for three hours with frequent breaks, with a slight risk of falling due to the pelvic pain)). The ALJ's summary noted a significant gap in Ms. Hess' medical records, with no records from 2006, and very few records from 2007 and 2008. R. 25 (citing R. 349 (presenting to Dr. Whibley on February 2, 2007 with increased pelvic pain after Ms. Hess "had been doing really well," and after a generally normal physical exam, Dr. Whibley increased her Paxil dosage); R. 346-47 (presenting again a year later to Dr. Whibley on February 28, 2008, stating that she was off Paxil, had increased exercising, and was feeling the best she has in five years)).

The medical evidence records corroborate Ms. Hess' testimony that after apparent relief from the pain, in mid-2009 the pelvic and abdominal pain increased again, and she returned to doctors for recommended treatment, as summarized by the ALJ. *See* R. 55 ("It's been like that since the very beginning, which is why – and getting worse, in 2009, which is why in June or July of 2009, I started looking for answers again, with Dr. Whibley . . . . And she referred me to Dr. Sekhel."); *see also* R. 25 (citing R. 344 (stating to Dr. Whibley on March 4, 2009 that the pain is better now, she is off Paxil, and feels well); R. 341 (called Dr. Whibley's office on June

11, 2009, stating the pelvic pain is back, and requesting the name of a pain management specialist with interest in exploring laparoscopic surgery; Dr. Whibley referred Ms. Hess to gynecologist Dr. Khaled Sakhel for a second opinion); R. 603-604 (presenting to Dr. Sakhel on July 1, 2009 with complaints of pelvic pain; discussed etiology of chronic pelvic pain and possible treatment options, including skin site local anesthetic injections, going back on Paxil, and diagnostic laparoscopy); R. 602 (referred by Dr. Sakhel for gynecological ultrasound on July 30, 2009; results generally normal, but a nebothian cyst was noted on the cervix, and a simple cyst was noted on the right ovary); R. 601 (followed-up with Dr. Sakhel on August 3, 2009 with continued complaints of lower abdomen pain; discussed possibility that pain could be gastrointestinal related, considered future diagnostic laparoscopy to identify possible scar tissue, referred to Dr. Williams and Dr. James Lukban for additional testing); R. 327-38, 560-61 (examined by gastroenterologist Dr. Williams on August 25, 2009; results of exam generally normal with no abdominal tenderness; recommended upper gastrointestinal/small bowel study, which showed no fluoroscopic explanation for pain); R. 592-93 (examined by urologist and gynecologist Dr. James Lukban on September 11, 2009, who noted mild lower left quadrant discomfort upon palpation and diagnosed Ms. Hess with chronic pelvic pain, and likely pelvic floor muscle spasm; recommended physical therapy and subsequent follow-up appointment); R. 577-82 (followed up with Dr. Sakhel on October 5, 2009; noted mild improvement, but pain still present; tentatively scheduled laparoscopy); R. 572-73 (followed-up with Dr. Sakhel on November 23, 2009; "Patient said she is getting better with physical therapy. We will at this point cancel the scheduled laparoscopy since she is improving but still has significant pain. She was given a script for Paxil 10mg daily for chronic pelvic pain.")).

10

Lastly, after her consultation and examination with Dr. Lukban, Ms. Hess attended physical therapy from September 15, 2009 until December 4, 2009. *See generally* R. 605-623. The ALJ accurately summarized these records to reflect that around the time Dr. Sakhel cancelled the diagnostic laparoscopy procedure, Ms. Hess was also discharged from physical therapy because she had "met her goals," she reported experiencing minimal to no pelvic/abdominal pain, and returned to light exercise. R. 25 (citing R. 606).

At this point in the decision, the ALJ did not summarize additional medical record evidence from post-December 31, 2009, the DLI, because "[t]here are no further relevant records pertaining to the period under consideration here," i.e., the period from alleged onset date of disability to the date last insured, May 28, 2004 to December 31, 2009. R. 25.[2] The ALJ did note, however, without providing a detailed summary of the medical records as he did for the "relevant" period, "that following the date last insured, [Ms. Hess] proceeded with additional treatment for her impairments, including a surgical procedure in August 2010 for laparoscopic left salpingo-oophorectomy, fulguration of endometriosis, and a trigger point injection. She also

---

[2] The following post-December 31, 2009 medical evidence is in the record, but was not discussed or considered by the ALJ, as summarized by the Acting Commissioner in her memorandum in support of her motion for summary judgment. *See* ECF No. 16 at 8-10. On July 22, 2010, Ms. Hess was seen by gynecologist Dr. Rebecca Ryder, she received a trigger point injection on her hysterectomy scar, which she tolerated well. On August 3, 2010, Ms. Hess received another injection, noting improvement on the surface of her skin, but deep pain within that prevented her from standing for prolonged periods. *Id.* (citing R. 357-58). On August 18, 2010, Ms. Hess stated: "Over the years pain from her physical impairments flared up at one time or another [and she was] able to manage it." *Id.* at 9 (citing R. 804). On August 20, 2010, on referral from Dr. Whibley, Ms. Hess saw pain management specialist Dr. Robert Hansen, who prescribed opioid analgesics. *Id.* at 9 (citing R. 339-40, 359-60, 799-800). On August 31, 2010, Dr. Ryder performed three procedures on Ms. Hess: laparoscopic left salpingo-oophorectomy, fulguration of endometriosis, and trigger point injection. *Id.* (citing R. 657). Dr. Ryder found adhesions. *Id.* at 10 (citing R. 682). On September 16, 2010, Ms. Hess still reported feeling pain but had gotten better, and Dr. Ryder expected a slow recovery. *Id.* (citing 355). On October 28, 2010, Ms. Hess reported that her pain was back to baseline, and she was sitting on a pillow and using a stepping stool. *Id.* (citing R. 354). On January 18, 2011, Ms. Hess was seen by urologist Dr. William Rawls, who noted that Ms. Hess was still having a hard time walking any distance and that walking increased her pelvic pain. *Id.* (citing R. 704-706). On June 14, 2011, Dr. Hansen opined that Ms. Hess would not be able to perform sedentary or light work. *Id.* (citing R. 697). On February 4, 2012, Dr. Hansen opined that Ms. Hess' pelvic pain is increased by sitting, standing, and walking, and that she would need to move to a reclined position after being in any one position for ten minutes. *Id.* at 10 (citing R. 823).

11

underwent additional physical therapy and pain management." R. 26 (citing R. 639-675, R. 713-749, 750-806). In light of the medical evidence as summarized above, the ALJ concluded:

> The undersigned notes that the claimant's statements about her symptoms and limitations are only partially credible for the period prior to December 31, 2009, largely due to the objective medical evidence and her treatment history. As noted above, during the applicable period, the claimant had a number of normal physical examinations, as well as several examinations where she was noted to have only minimal or mild abdominal/pelvic tenderness. This does not correlate with her allegations of severe pain. Moreover, several of the notes from the claimant's treating providers show that the claimant's pain either improved or ceased at times during this period. For instance, the record indicates that the claimant actually had little treatment between late 2005 and mid 2009, and Dr. Whibley's notes show that the claimant's pain improved and she generally felt well during this time. Though the claimant apparently had a recurrence in her pain in mid-2009, when she began treating with Dr. Sakhel, the record reflects that her symptoms greatly improved with physical therapy, to the point where she indicated that she had minimal to no pelvic/abdominal pain, and that she had returned to exercise. Moreover, her planned laparoscopy was cancelled at that time. Overall, *though the undersigned acknowledges the claimant's significant treatment history and complaints of pain after December 31, 2009*, the records prior to that date generally do not support her current allegations.

R. 26 (emphasis added). The ALJ went on to discuss the medical opinion evidence, comprised of opinions from Dr. Hansen, Ms. Hess' pain management specialist, Dr. Vargas, and the state agency medical consultants. R. 26-27. However, for the reasons discussed below, the undersigned need not summarize or discuss the medical opinions, and the weight assigned to those opinions, by the ALJ.

Ms. Hess raises two issues on judicial review: First, whether the ALJ erred as a matter of law by failing to properly evaluate and consider the medical evidence dated after December 31, 2009, the date last insured. ECF No. 14 at 13-17. Second, whether the ALJ erred in giving little weight to the opinion of treating physician Dr. Hansen. *Id.* at 17-26. While Ms. Hess must show that she became disabled before her date last insured to be eligible for Social Security benefits,

42 U.S.C. §§ 423(a)(1)(A), (c)(1); 20 C.F.R. §§ 404.101(a), 404.131(a), the medical evidence or evaluations made after her date last insured "are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's DLI." *Bird v. Commissioner*, 699 F.3d 337, 340 (4th Cir. 2012) (citing *Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987)). Accordingly, the ALJ committed legal error by failing to properly consider all of the record evidence, specifically the post-DLI evidence, and the final decision of the Acting Commissioner must be vacated and remanded. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Therefore, the undersigned recommends that the final decision of the Acting Commissioner be vacated, and that Ms. Hess' application be remanded for additional review of the total record.

## V. ANALYSIS

Ms. Hess argues that the "ALJ failed to afford appropriate consideration to evidence post-dating Ms. Hess' date last insured of December 31, 2009," specifically, evidence of the August 2010 surgical procedure, which confirmed the earlier suspicions of treating physicians that Ms. Hess's abdominal/pelvic pain could be associated with pelvic adhesions. ECF No. 14 at 13-16. Additionally, because the same surgery was originally planned for late 2009, and because the surgery was eventually performed for the original reasons, i.e., diagnostic laparoscopy to determine the etiology of her abdominal pain, Ms. Hess argues the requisite "linkage" is present and that the ALJ committed legal error when he did not consider post-December 31, 2009 records, stating: "There are no further relevant records pertaining to the period under consideration here." *Id.* at 16-17; *see also* R. 25. Somewhat surprisingly, the Acting Commissioner argues that the ALJ did in fact "consider[] the medical evaluations made after

13

Plaintiff's date last insured as relevant evidence," and cites the ALJ's assignment of "little weight" to Dr. Hansen's post-December 31, 2009 medical opinion, which supposedly "demonstrates that the evidence was neither barred nor considered irrelevant." ECF No. 16 at 19-20 ("If the ALJ erred—which we submit is not the case—the error was not in excluding relevant evidence but rather with improperly weighing relevant evidence."). The ALJ spent close to two pages of the decision summarizing the medical evidence for the "relevant period," *see* R. 24-25, but peripherally mentioned the post-DLI evidence in one paragraph without significant specificity, after summarily concluding that "[t]here are no further relevant records pertaining to the period under consideration here," i.e., May 28, 2004 to December 31, 2009. R. 25-26. Based on the totality of the record and the ALJ's decision, the undersigned would find that the ALJ did not consider post-DLI medical evidence that was linked the pre-DLI symptoms and medical evidence. This constitutes legal error, and therefore, the undersigned recommends remand.

In short, the Acting Commissioner's final decision must be remanded pursuant to *Bird v. Commissioner*, 699 F.3d 337 (4th Cir. 2012). There, the Fourth Circuit held that "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." *Id.* at 341. To reach this holding, the court relied primarily on two previous decisions: *Moore v. Finch*, 418 F.2d 1224 (4th Cir. 1969) and *Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). In *Moore*, the Fourth Circuit "recognized that evidence created after a claimant's DLI, which permits an inference of linkage between the claimant's post-DLI state of health and her pre-DLI condition, could be 'most cogent proof' of a claimant's pre-DLI disability." *Bird*, 699 F.3d at 341 (quoting *Moore*,

14

418 F.2d at 1226).  In *Johnson*, there was no "linkage" and no evidence that the post-DLI impairments "existed before the claimant's DLI," and therefore the evidence was not relevant and the ALJ was not required to give the post-DLI evidence retrospective consideration.  *Bird*, 699 F.3d at 341 (citing *Johnson*, 434 F.3d at 656 & n.8).  That is not the case here.

Instead, the record now before the Court is analogous to the record in *Bird* and *Moore*, because there is a "linkage" between Ms. Hess' post-DLI evidence or condition with her pre-DLI symptoms or condition.  The ALJ accurately summarized Ms. Hess' pre-DLI condition as "a number of physical examinations, as well as several examinations where she was noted to have only minimal or mild abdominal/pelvic tenderness." R. 26.  The pre-DLI medical records described the pelvic pain as chronic, R. 352-53, 556-57, 592-93, 603-604, 870-74, doctors speculated that the pain might be associated with pelvic adhesions, R. 334-35, 556-57, 870-74, and accordingly suggested that future diagnostic laparoscopic surgery might be warranted.  R. 577-82, 601, 603-604.  The post-DLI medical records indicate that Ms. Hess underwent diagnostic laparoscopic left salpingo-oophorectomy surgery, fulguration of endometriosis, and trigger point injections, with pelvic adhesions present.  *See generally* R. 639-75.  Specifically, during surgery, "[d]ue to the significantly enlarged ovarian vein and a normal-appearing right tube and ovary, [Dr. Ryder] decided to do a left salpingo-oophorectomy [removal of the left ovary and fallopian tube]." R. 657-58.  Subsequent surgical pathology reports described the presence of "tuboovarian adhesions" and "thin fibrous adhesions" on the removed specimens.  R. 661. Post-DLI medical evidence shows that Ms. Hess underwent a diagnostic surgical procedure that was originally scheduled for the pre-DLI period, but nonetheless underwent surgery to determine the etiology of her severe impairment: chronic pelvic/abdominal pain.  Needless to

15

say, "the record is not so persuasive as to rule out any linkage," and therefore, the ALJ should have retrospectively considered the post-DLI evidence. *Bird*, 699 F.3d at 341 (quoting *Moore*, 418 F.2d at 1226). Therefore, the ALJ committed legal error when he concluded that "[t]here are no further relevant records pertaining to the period under consideration here," and when he failed to consider, summarize, and factor Ms. Hess' post-DLI medical evidence into his decision, just as he so thoroughly did for the pre-DLI evidence. Moreover, in assigning Dr. Hansen's opinion "little weight," the ALJ noted that "no such opinions were actually rendered by treating physicians during the period at issue." R. 26. Thus, it is evident that while the ALJ was aware of the "retrospective" medical evidence and opinion evidence post-DLI, the ALJ did not consider such evidence, or give any significant weight to medical opinions, mainly because it was outside "the period under consideration here." Under *Bird*, this is error. Because the ALJ should have given retrospective consideration to the medical evidence of Hess' surgery and additional post-DLI evidence that can be linked to her pre-DLI abdominal/pelvic pain condition, the final decision of the Acting Commissioner should be vacated and remanded for further proceedings.

The Court has considered the possibility that, when the ALJ wrote "there are no further relevant records pertaining to the period under consideration here," what the ALJ meant was "there are no further relevant records *generated during* the period under consideration." His immediately subsequent reference to some of the post-DLI records might then be interpreted as his consideration of these records, and an ultimate determination that they did not establish the requisite linkage for consideration under *Bird*. In the final analysis, the Court rejects this interpretation. In the first instance, this is not what the ALJ said, and words should be given their intended, ordinary meaning. *Cf. Baerga v. Richardson*, 500 F.2d 309, 312-313 (3d. Cir.

16

1974) ("It is incumbent upon the examiner to make *specific* findings—the court *may not speculate* as to his findings.  We think it is not too much to require that an administrative decision that a claimant is not eligible . . . be supported by explicit findings of all facts that are essential to the conclusion of ineligibility.  Recognizing the heavy work burden on hearing examiners acting under the Social Security Act, we emphasize that the above comments are designed to be helpful in the joint work of the administrative agency and the courts in this field.") (emphasis added) (internal quotation marks and citations omitted), *cert. denied*, 420 U.S. 931 (1975).  Second, following this statement, the ALJ mentioned some, but not all, of the post-DLI records, but did not discuss or analyze them:[3]

> The undersigned does note that following the date last insured, the claimant proceeded with additional treatment for her impairments, including a surgical procedure in August 2010 for laparoscopic left salpingo-oopherectomy, fulguration of endometriosis, and a trigger point injection (Ex. 19F). She also underwent additional physical therapy and pain management (See Exs. 23F, 24F).

R. 26.  The ALJ then referenced Dr. Hansen's medical source statements.  *Id.*  This lack of discussion contrasts notably with his analysis of the pre-DLI records.  *Compare* R. 24-25, *with* 26.  Finally, while the ALJ "acknowledges the claimant's significant treatment history and complaints of pain after December 31, 2009," and then concludes that "the records prior to that date generally do not support her current allegations," he failed to provide any analysis showing that he considered the post-DLI records in the context of exploring whether they could be linked to Ms. Hess's pre-DLI condition, as *Bird* requires.  R. 26; *see also Schoofield v. Barnhart*, 220 F. Supp. 2d 512, 519 (D. Md. 2002) ("This court has long required specific references to the evidence supporting the ALJ's decision as part of the ALJ's 'duty of explanation.'") (quoting

---

[3] While the ALJ cited to records from Chesapeake General Hospital, Erin Grace, physical therapist with Urology of Virginia, and Dr. Robert Hansen, he did not reference the records from Dr. Rebecca Ryder with Gynecology Specialists. R. 26.

*Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985) (additional citations omitted). Accordingly, the undersigned concludes that the ALJ made the finding that the post-DLI records were not relevant to the period under consideration, and this finding constitutes error.

"Because we conclude that the ALJ committed legal error by failing to consider properly all the record evidence, an assessment of the weight of the evidence, [Ms. Hess' second issue raised on judicial review] must be left to the ALJ on remand in the first instance." *Bird*, 699 F.3d at 341 n.1; *accord Cox v. Heckler*, 770 F.2d 411, 413 n.3 (4th Cir. 1985) ("Because of [this recommended] disposition, [the undersigned need] not address the remaining contentions raised by claimant in this appeal.").

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** that Ms. Hess' motion for summary judgment, ECF No. 14, be **GRANTED** to the extent it seeks reversal and remand of the Acting Commissioner's final decision; the Defendant's motion for summary judgment, ECF No. 15, be **DENIED**, the final decision of the Acting Commissioner be **VACATED**, and that this matter be **REMANDED** for further proceedings consistent with this recommendation.

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A

18

party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).

   2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

   The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to all counsel of record.

                                        Lawrence R. Leonard
                                        United States Magistrate Judge

Norfolk, Virginia
May 7, 2014

## CLERK'S MAILING CERTIFICATE

A copy of this Report and Recommendation was mailed on this date to the following:

Mr. David L. Horne
David L. Horne PLLC
5041 Corporate Woods Drive, Suite 185
Virginia Beach, Virginia 23462
Counsel for the Plaintiff

Mr. Mark A. Exley
United States Attorney's Office
World Trade Center
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Counsel for the Defendant

Fernando Galindo,
Clerk of Court

By:      _____

Deputy Clerk
May _____, 2014